**<u>Exhibit [A]</u>**

# Small Residential Income Property Appraisal Report

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

## SUBJECT

| | | | | |
|---|---|---|---|---|
| Property Address 535 McCaugherty Run Rd | City Darlington | State PA | Zip Code 16115 |

Borrower Phyllis Haney    Owner of Public Record Phyllis F Haney    County Beaver

Legal Description 3273123

Assessor's Parcel # ▮▮▮▮▮▮▮    Tax Year 2018    R.E. Taxes $ 5473

Neighborhood Name Popa Plan, Darlington Township    Map Reference Parcel B    Census Tract 6006.01

Occupant [X] Owner [ ] Tenant [ ] Vacant    Special Assessments $ 0    [ ] PUD    HOA $ 0    [ ] per year [ ] per month

Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)

Assignment Type [ ] Purchase Transaction [ ] Refinance Transaction [X] Other (describe) Other

Lender/Client Wells Fargo Bank NA    Address 3201 N 4th Ave 3rd Fl, Sioux Falls, SD 57104

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [ ] Yes [X] No

Report data source(s) used, offering price(s), and date(s).

Per the West Penn MLS, the subject has not been listed in the past 12 months.

## CONTRACT

I [ ] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $    Date of Contract    Is the property seller the owner of public record? [ ] Yes [ ] No  Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No

If Yes, report the total dollar amount and describe the items to be paid.

## NEIGHBORHOOD

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | 2-4 Unit Housing Trends | 2-4 Unit Housing | Present Land Use % |
|---|---|---|---|
| Location [ ] Urban [X] Suburban [ ] Rural | Property Values [ ] Increasing [X] Stable [ ] Declining | PRICE $(000) / AGE (yrs) | One-Unit 70 % |
| Built-Up [X] Over 75% [ ] 25-75% [ ] Under 25% | Demand/Supply [ ] Shortage [X] In Balance [ ] Over Supply | | 2-4 Unit 10 % |
| Growth [ ] Rapid [X] Stable [ ] Slow | Marketing Time [ ] Under 3 mths [X] 3-6 mths [ ] Over 6 mths | Low 3 / 0 | Multi-Family 5 % |
| Neighborhood Boundaries | | High 320 / 200 | Commercial 10 % |
| North- Lawrence Co, East- Big Beaver Boro, South- South Beaver Twp, West- Ohio | | Pred. 56 / 85 | Other Vacant 5 % |

Neighborhood Description

There are no apparent adverse factors which should affect the subject's marketability. Competitive marketing is essential in today's market place. Schools, shopping, houses of worship and employment are with a close proximity via Route #51. The subject property is located in a viable neighborhood which reflects a successful mixture of commercial uses, multi-family and single family properties. See additional comments

Market Conditions (including support for the above conclusions)

The market value expressed in this report reflects market conditions as of the effective date of the appraisal. The current market conditions remain favorable but competitive. Mortgage's continue to be readily available to qualified buyers. Government insured and conventional loans make up 95% of the market finance.

## SITE

Dimensions Numerous    Area 8.92    Shape Irregular    View Average

Specific Zoning Classification RA    Zoning Description Residential Agricultural

Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No  If No, describe.

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements-Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [ ] | [X] Well | Street Asphalt | [X] | [ ] |
| Gas | [ ] | [X] Oil | Sanitary Sewer | [ ] | [X] Septic | Alley None | [ ] | [ ] |

FEMA Special Flood Hazard Area [ ] Yes [X] No  FEMA Flood Zone X    FEMA Map # 42007C0030D    FEMA Map Date 08/17/2015

Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No  If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No  If Yes, describe

The site is an inside level lot with 100% land utility. No adverse conditions were visible that would have an effect on value. See attached addendum

## IMPROVEMENTS

| General Description | Foundation | Exterior Description materials/condition | Interior materials/condition |
|---|---|---|---|
| Units [X] Two [ ] Three [ ] Four | [ ] Concrete Slab [ ] Crawl Space | Foundation Walls Stone,CB/Avg | Floors Unknown |
| [ ] Accessory Unit (describe below) | [X] Full Basement [ ] Partial Basement | Exterior Walls Frame/Avg | Walls Unknown |
| # of Stories 2 | Basement Area 612/1604 sq. ft. | Roof Surface Asphalt Shingle/A | Trim/Finish Unknown |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | Basement Finish 0 % | Gutters & Downspouts Aluminum/Avg | Bath Floor Unknown |
| [X] Existing [ ] Proposed [ ] Under Const. | [X] Outside Entry/Exit [ ] Sump Pump | Window Type Mixed/Avg | Bath Wainscot Unknown |
| Design (Style) Colonial | Evidence of [ ] Infestation | Storm Sash/Insulated Yes/Avg | |
| Year Built 1900/1985 | [ ] Dampness [ ] Settlement | Screens Yes/Avg | **Car Storage** |

| | | | |
|---|---|---|---|
| Effective Age (Yrs) 20/55-18/55 | **Heating/Cooling** | **Amenities** | [ ] None |
| Attic [ ] None | [X] FWA [ ] HWBB [ ] Radiant | [X] Fireplace(s) # 1 [ ] WoodStove(s) # 0 | [X] Driveway # of Cars 2 |
| [ ] Drop Stair [ ] Stairs | [ ] Other Fuel Oil | [X] Patio/Deck 0/1 [ ] Fence 0 | Driveway Surface Gravel |
| [X] Floor [ ] Scuttle | [ ] Central Air Conditioning | [ ] Pool None [X] Porch 1 | [X] Garage # of Cars 2 |
| [ ] Finished [ ] Heated | [ ] Individual [X] Other None | [ ] Other Shed | [ ] Carport # of Cars 0 |
| | | | [X] Att. [ ] Det [ ] Built-in |

# of Appliances  Refrigerator    Range/Oven    Dishwasher    Disposal    Microwave    Washer/Dryer    Other (describe)

| | | | | |
|---|---|---|---|---|
| Unit # 1 contains: | 5 Rooms | 2 Bedroom(s) | 1 Bath(s) | 1980 Square Feet of Gross Living Area |
| Unit # 2 contains: | 5 Rooms | 3 Bedroom(s) | 1.5 Bath(s) | 1604 Square Feet of Gross Living Area |
| Unit # 3 contains: | 0 Rooms | 0 Bedroom(s) | 0 Bath(s) | 0 Square Feet of Gross Living Area |
| Unit # 4 contains: | 0 Rooms | 0 Bedroom(s) | 0 Bath(s) | 0 Square Feet of Gross Living Area |

Additional features (special energy efficient items, etc.)

Insulated windows and doors.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).

No functional or external obsolescence was charged. There was no visible deferred maintenance on the exterior of the subject as of the day of the inspection.

# Small Residential Income Property Appraisal Report

## IMPROVEMENTS

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☐ No  If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No  If No, describe

Is the property subject to rent control? ☐ Yes ☒ No  If Yes, describe

The following properties represent the most current, similar, and proximate comparable rental properties to the subject property. This analysis is intended to support the opinion of the market rent for the subject property.

## COMPARABLE RENTAL DATA

| FEATURE | SUBJECT | COMPARABLE RENTAL # 1 | COMPARABLE RENTAL # 2 | COMPARABLE RENTAL # 3 |
|---|---|---|---|---|
| Address | 535 McCaugherty Run Rd  Darlington  PA  16115 | 35 Berry Street  Baden  PA  15005 | 288/292 Martin&Sportman Rd  South Beaver Twp  PA  16115 | 2412 W Irwin St  Aliquippa  PA  15001 |
| Proximity to subject | | 17.17 miles SE | 3.85 miles SW | 17.00 miles SE |
| Current Monthly Rent | $ 0 | $ 1550 | $ 1650 | $ 1700 |
| Rent/Gross Bldg. Area | $ 0.00 sq. ft. | $ 2.69 sq. ft. | $ 1.60 sq. ft. | $ 0.99 sq. ft. |
| Rent Control | ☐ Yes ☒ No | ☐ Yes ☒ No | ☐ Yes ☒ No | ☐ Yes ☒ No |
| Data Source(s) | | WPMLS #1319643 | WPMLS #1231532 | WPMLS # |
| Date of Lease(s) | Unknown | Unknown | Unknown | Unknown |
| Location | Darlington | Baden | South Beaver Twp | Aliquippa |
| Actual Age | 118 | 70 | 80 | 93 |
| Condition | Avg | Avg | Avg | Avg |
| Gross Building Area | 1980/1604 | 576/1260 | 1032/1000 | 1723 |

### Unit Breakdown

| Unit Breakdown | Rm Count Tot | Br | Ba | Size Sq. Ft. | | Rm Count Tot | Br | Ba | Size Sq. Ft. | Monthly Rent | Rm Count Tot | Br | Ba | Size Sq. Ft. | Monthly Rent | Rm Count Tot | Br | Ba | Size Sq. Ft. | Monthly Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unit # 1 | 5 | 2 | 1 | 1980 | | 4 | 2 | 1 | 576 | $ 600 | 6 | 3 | 2 | 1032 | $ 1100 | 3 | 1 | 1 | 750 | $ 900 |
| Unit # 2 | 5 | 3 | 1.5 | 1604 | | 5 | 3 | 1 | 1260 | $ 950 | 4 | 2 | 1 | 1000 | $ 550 | 4 | 1 | 1 | 973 | $ 800 |
| Unit # 3 | | | | | | | | | | $ | | | | | $ | | | | | $ |
| Unit # 4 | | | | | | | | | | $ | | | | | $ | | | | | $ |
| Utilities Included | None | | None | | | None | | | | | None | | | | | None | | | | |

Analysis of rental data and support for estimated market rents for the individual subject units reported below (including the adequacy of the comparables, rental concessions, etc.)

Comparable rentals were taken from the subject's market area and indicate a rental range from $1,550 to $1,700 per month.

## SUBJECT RENT SCHEDULE

Rent Schedule: The appraiser must reconcile the applicable indicated monthly market rents to provide an opinion of the market rent for each unit in the subject property.

| | Leases | | Actual Rent | | | Opinion Of Market Rent | | |
|---|---|---|---|---|---|---|---|---|
| Unit # | Lease Date Begin Date | End Date | Per Unit Unfurnished | Furnished | Total Rents | Per Unit Unfurnished | Furnished | Total Rents |
| 1 | Unknown | Unknown | $ Unknown | $ N/A | $ Unknown | $ 750 | $ N/A | $ 750 |
| 2 | Unknown | Unknown | Unknown | N/A | Unknown | 850 | N/A | 850 |
| 3 | | | | | | | | |
| 4 | | | | | | | | |

| Comment on lease data | Total Actual Monthly Rent | $ 0 | Total Gross Monthly Rent | $ 1600 |
|---|---|---|---|---|
| None | Other Monthly Income (itemize) | $ 0 | Other Monthly Income (itemize) | $ 0 |
| | Total Actual Monthly Income | | Total Estimated Monthly Income | $ 1600 |

Utilities included in estimated rents  ☐ Electric ☐ Water ☐ Sewer ☐ Gas ☐ Oil ☐ Cable ☐ Trash collection ☐ Other (describe)

Comments on actual or estimated rents and other monthly income (including personal property)

No other monthly income. No actual rents are known.

## PRIOR SALE HISTORY

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data source(s)  Beaver County Court Records & West Penn MLS

My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.

Data source(s)  Beaver County Court Records & West Penn MLS

Report the results of the research and analysis of the prior sale history of the subject property and comparable sales (report additional prior sales on page 4).

| ITEM | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | Beaver Co. Deeds | Beaver Co. Deeds | Beaver Co. Deeds | Beaver Co. Deeds |
| Effective Date of Data Source(s) | 07/17/2018 | 07/17/2018 | 07/17/2018 | 07/17/2018 |

Analysis of prior sale or transfer history of the subject property and comparable sales

There were no applicable prior sales/transfers for the subject or comparable sales.

# Small Residential Income Property Appraisal Report

| | | |
|---|---|---|
| There are 14 comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 75000 | | to $ 325000 |
| There are 16 comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 75000 | | to $ 325000 |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Address | 535 McCaugherty Run Rd Darlington, PA 16115 | 35 Berry Street Baden, PA 15005 | 68/70 Beaver Street Fallston, PA 15066 | 288/292 Martin/Sportsman Rd South Beaver Twp, PA 16115 |
| Proximity to subject | | 17.17 miles SE | 9.36 miles SE | 3.85 miles SW |
| Sales Price | $ | $ 125200 | $ 75800 | $ 320000 |
| Sales Price/Gross Bldg.Area | $ 0.00 sq. ft. | $ 68.19 sq. ft. | $ 35.03 sq. ft. | $ 157.48 sq. ft. |
| Gross Monthly Rent | $ 0 | $ 1550 | $ 1300 | $ 1650 |
| Gross Rent Multiplier | | 80.77 | 58.31 | 193.94 |
| Price Per Unit | $ | $ 62600 | $ 37900 | $ 160000 |
| Price Per Room | $ | $ 13911 | $ 7580 | $ 32000 |
| Price Per Bedroom | $ | $ 25040 | $ 15160 | $ 64000 |
| Rent Control | ☐Yes ☒No | ☐Yes ☒No | ☐Yes ☒No | ☐Yes ☒No |
| Data Source(s) | | West Penn MLS #1319643 | West Penn MLS #1214043 | West Penn MLS #1231532 |
| Verification Source(s) | | Beaver County Court Records | Beaver County Court Records | Beaver County Court Records |

| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustments | DESCRIPTION | +(-) $ Adjustments | DESCRIPTION | +(-) $ Adjustments |
|---|---|---|---|---|---|---|---|
| Sales or Financing Concessions | | Closed Cnv/Concession | 0 | Closed FHA/Concession | | Closed Conv/None Knw | 0 |
| Date of Sale/Time | | 4/20/18DOM40 | | 11/16/16dom190 | | 4/3/17DOM215 | |
| Location | Darlington | Baden | | Fallston | | South Beaver | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 8.92 ac | .09 ac | 31000 | .23 ac | 30500 | 72.42 | -150000 |
| View | Average | Average | | Average | | Average | |
| Design (Style) | Colonial/Ranch | Colonial/Ranch | | Colonial/Ranch | | CapeCod/Ranch | 0 |
| Quality of Construction | Frame | Brick/Frame | 0 | Frame | | Brick/Stucco | 0 |
| Actual Age | 118/33 | 70/Unknown | | 98/95 | 0 | 1938/Unknown | |
| Condition | Average | Average | | Average | | Average | |
| Gross Building Area | 1980/1604 | 576/1260 | 17500 | 1440/727 | 14000 | 1032/1000 | 15500 |
| Unit Breakdown | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Unit # 1 | 5   2   1 | 4   2   1 | 0 | 6   3   1 | 0 | 6   3   2 | -1500 |
| Unit # 2 | 5   3   1.5 | 5   3   1 | 1000 | 4   2   1 | 1000 | 4   2   1 | 1000 |
| Unit # 3 | | | | | | | |
| Unit # 4 | | | | | | | |
| Basement Description | 612/1604 | 573/630 | 0 | 644/727 | 0 | 840/1000 | 0 |
| Basement Finished Rooms | Unfinished | Unfinished | | Unfinished | | Unfinished | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | FA/No | FA/No | | FA/No | | FA/No | |
| Energy Efficient Items | Rated Average | Rated Average | | Rated Average | | Rated Average | |
| Parking On/Off Site | 2 Car Garage | None | 8000 | 2 Car Garage | | 2 Car Garage | |
| Porch/Patio/Deck | Deck,Porch | Porches | 0 | Porches | 0 | Porches | 0 |
| Fireplace | 1 F/P | None | 1500 | None | 1500 | None | 1500 |
| | | | | | | | |
| Net Adjustment (Total) | | ☒ +  ☐ - | $ 59000 | ☒ +  ☐ - | $ 47000 | ☐ +  ☒ - | $ 133500 |
| Adjusted Sale Price of Comparables | | Net Adj. 47.1 % Gross Adj. 47.1 % | $ 184200 | Net Adj. 62.0 % Gross Adj. 62.0 % | $ 122800 | Net Adj. -41.7 % Gross Adj. 53.0 % | $ 186500 |
| Adj. Price Per Unit (Adj. SP Comp/ # of Comp Units) | | $ 92100 | | $ 61400 | | $ 93250 | |
| Adj. Price Per Room (Adj. SP Comp/ # of Comp Rooms) | | $ 20467 | | $ 12280 | | $ 18650 | |
| Adj. Price Per Bedrm (Adj. SP Comp/ # of Comp Bedrooms) | | $ 36840 | | $ 24560 | | $ 37300 | |

| Value Per Unit $ 90000 X 2 Units = $ 180000 | Value Per GBA $ 52 X 3584 GBA = $ 186368 |
|---|---|
| Value Per Rm. $ 18500 X 10 Rooms = $ 185000 | Value Per Bdrms. $ 36000 X 5 Bdrms. = $ 180000 |

Summary of Sales Comparison Approach including reconciliation of the above indicators of value.

The subject market area was considered to be all of Beaver, Lawrence County. The search criteria included comparable duplex/2 unit sales from the prior 24 months. The three (3) closed sales displayed are considered to be the best indicators of value for the subject. Due to the infrequency of sales similar to the subject, it was necessary to broaden the time period for Comp #2,3 and to expand the neighborhood for Comp #1,2,3. It was also necessary to make larger than normal adjustments on the grid for Comp #1,2,3. Sale concessions were paid for comp #1&2. After a review of the list price, sale price & financing type, it was the Appraiser's opinion that an adjustment was not considered to be necessary. See additional comments

Indicated Value by Sales Comparison Approach $ 180000

Total gross monthly rent $ 1600 X gross rent multiplier (GRM) 115 = $ 184000 Indicated Value by the Income Approach

Comments on income approach including reconciliation of the GRM

The G.R.M.'s of the 3 comparable sales utilized are a wide range, however, due to the infrequency of 2 dwellings on acreage, are considered to be reliable.

| Indicated Value by: Sales Comparison Approach $ 180000 | Income Approach $ 184000 | Cost Approach (if developed) $ 0 |
|---|---|---|

The Cost, Sales Comparison and Income Approaches were originally considered for this appraisal report. After analysis of market data, the most emphasis was placed on the Sales Comparison Approach, which is supported by the Income Approach. The Cost Approach was not considered applicable.

This appraisal is made ☒ "as is," ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:

See Attached Addendum

**Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 180000 as of 07/17/2018 , which is the date of inspection and the effective date of this appraisal.**

# Small Residential Income Property Appraisal Report

**A D D I T I O N A L   C O M M E N T S**

Neighborhood:
The subject property is located within the boundaries of the Blackhawk School District, in the Township of Darlington, County of Beaver, State of PA.
The subject property is located in a viable neighborhood which reflects a successful mixture of commercial uses, multi-family and single family properties.
The subject value exceeds the predominancy value range of this neighborhood, however, due to the long term stability of this neighborhood, there is no reduction in value. This has no effect on the marketability of the subject. The subject is not considered to be an over improvement for it's immediate neighborhood.

Sales Comparison Comments:
Any site adjustment made refers to each site's overall value, "not" the size of each lot. Overall value is based on features, such as, topography, utility, location, shape, frontage and curb appeal. Comp #1&2 were considered to have an inferior site value to the subject. Comp #3 was considered to have a superior site value to the subject. An adjustment was considered based on market data.
No design adjustment was considered necessary for the style difference of comp #3.
No actual age adjustment is considered. The actual age is considered under condition, along with updates & maintenance. All comps were considered to have the same condition as the subject.
Above grade living area is adjusted for GLA, not room count. It was necessary to have a more than 20% GLA variance for comp #1,2&3. The Appraiser was unable to bracket the subject's bath count for unit #2 with closed sales from the prior 24 months.
The subject's architecture is compatible with the other improvements in the area. It is not common in this market place to have 2 units on acreage like the subject. All closed sales were considered in the final analysis. Most weight was placed on comp #1 due to it's more recent sale date and comp #3 due to it's proximity to the subject.

Other:
The Intended User of this appraisal report is the Lender/Client. The Intended Use is to evaluate the property that is the subject of this appraisal for a mortgage finance transaction, subject to the stated Scope of Work, purpose of the appraisal, reporting requirements of this appraisal report form, and Definition of Market Value. No additional Intended Users are identified by the appraiser.
I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.
There is an effective market of competing properties on the market in this area. This indicates that supply and demand are in balance. Reasonable exposure period is estimated to be under 6 months. Typical holding period is 5-7 years.
There is no known oil/gas lease on the subject property. There is no active drilling or equipment on the subject property. To the Appraiser's knowledge, there is no wells or tanks within 200 feet of the subject property.
Comps were driven by, however, the Appraiser chose to use MLS photos which better depict the sale.

## COST APPROACH TO VALUE (not required by Fannie Mae)

**C O S T   A P P R O A C H**

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)

Beaver County court records & WPMLS

| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | | OPINION OF SITE VALUE ............................................. =$ | 50000 |
|---|---|---|---|
| Source of cost data | | Dwelling       Sq. Ft. @ $           ............ =$ | |
| Quality rating from cost service       Effective date of cost data | | Sq. Ft. @ $           ............ =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | =$ | |
| The Cost Approach was not considered to be applicable. | | Garage/Carport       Sq. Ft. @ $           ............ =$ | |
| | | Total Estimate of Cost-New ............................ =$ | |
| | | Less       Physical      Functional      External | |
| | | Depreciation                           =$ (         ) | |
| | | Depreciated Cost of Improvements .................. =$ | |
| | | "As-is" Value of Site Improvements ................. =$ | |
| Estimated Remaining Economic Life (HUD and VA only)       35       Years | | Indicated Value by Cost Approach ............................. =$ | 0 |

## PROJECT INFORMATION FOR PUDs  (if applicable)

**P U D   I N F O R M A T I O N**

Is the developer/builder in control of the Homeowners' Association (HOA)?       ☐ Yes   ☐ No     Unit type(s)   ☐ Detached   ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| Total number of phases | Total number of units | Total number of units sold |
|---|---|---|
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD?       ☐ Yes   ☐ No  If Yes, date of conversion

Does the project contain any multi-dwelling units?       ☐ Yes   ☐ No  Data source(s)

Are the units, common elements, and recreation facilities complete?       ☐ Yes   ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?       ☐ Yes   ☐ No   If Yes, describe the rental terms and options.

Describe common elements and recreational facilities

# Small Residential Income Property Appraisal Report

This report form is designed to report an appraisal of a two- to four-unit property, including a two- to four-unit property in a planned unit development (PUD). A two- to four-unit property located in either a condominium or cooperative project requires the appraiser to inspect the project and complete the project information section of the Individual Condominium Unit Appraisal Report or the Individual Cooperative Interest Appraisal Report and attach it as an addendum to this report.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements, including each of the units. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property, including all units. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison and income approaches to value. I have adequate market data to develop reliable sales comparison and income approaches to value for this appraisal assignment. I further certify that I considered the cost approach to value but did not develop it, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration,
the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the
inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

# Small Residential Income Property Appraisal Report

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

## APPRAISER

Signature

Name   Nicholas Richard Zarnich, II

Company Name   Zarnich & Associates

Company Address   433 State Street

Beaver                    , PA      15009

Telephone Number   724-728-7270

Email Address   Zarnich.appraisers@comcast.net

Date of Signature and Report   07/23/2018

Effective Date of Appraisal   07/17/2018

State Certification #   RL139981

or State License #

or Other (describe) _____ State # _____

State   PA

Expiration Date of Certification or License   06/30/2019

ADDRESS OF PROPERTY APPRAISED

535 McCaugherty Run Rd

Darlington                    , PA      16115

APPRAISED VALUE OF SUBJECT PROPERTY $   180000

LENDER/CLIENT

Name   Northeast

Company Name   Wells Fargo Bank NA

Company Address   3201 N 4th Ave 3rd Fl

Sioux Falls              , SD      57104

Email Address

## SUPERVISORY APPRAISER (ONLY IF REQUIRED)

Signature

Name

Company Name

Company Address

_____ , _____ _____

Telephone Number

Email Address

Date of Signature

State Certification #

or State License #

State

Expiration Date of Certification or License _____

SUBJECT PROPERTY

☐ Did not inspect subject property

☐ Did inspect exterior of subject property from street

Date of Inspection

☐ Did inspect interior and exterior of subject property

Date of Inspection

COMPARABLE SALES

☐ Did not inspect exterior of comparable sales from street

☐ Did inspect exterior of comparable sales from street

Date of Inspection

# Small Residential Income Property Appraisal Report

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Address | 535 McCaugherty Run Rd, Darlington, PA 16115 | 201 Patterson Ave, West Mayfield, PA 15010 | 1010 Penn Ave, New Brighton, PA 15066 | |
| Proximity to subject | | 6.06 miles SE | 8.77 miles SE | |
| Sales Price | $ | $ 134900 | $ 85900 | $ |
| Sales Price/Gross Bldg.Area | $ 0.00 sq. ft. | $ 80.68 sq. ft. | $ 34.61 sq. ft. | $ sq. ft. |
| Gross Monthly Rent | $ 0 | $ 1200 | $ 1290 | $ |
| Gross Rent Multiplier | | 112.42 | 66.59 | |
| Price Per Unit | $ | $ 67450 | $ 42950 | $ |
| Price Per Room | $ | $ 14989 | $ 8590 | $ |
| Price Per Bedroom | $ | $ 44967 | $ 21475 | $ |
| Rent Control | ☐ Yes ☒ No | ☐ Yes ☒ No | ☐ Yes ☒ No | ☐ Yes ☐ No |
| Data Source(s) | | West Penn MLS #1297146 | West Penn MLS #1337742 | |
| Verification Source(s) | | Beaver County Court Records | Beaver County Court Records | |

| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustments | DESCRIPTION | +(-) $ Adjustments | DESCRIPTION | +(-) $ Adjustments |
|---|---|---|---|---|---|---|---|
| Sales or Financing Concessions | | Active, N/A | 0 | Active, N/A | 0 | | |
| Date of Sale/Time | | Listed | -4000 | Listed | -2500 | | |
| Location | Darlington | West Mayfield | | New Brighton | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | | |
| Site | 8.92 ac | .15 ac | 30500 | .13 ac | 30500 | | |
| View | Average | Average | | Average | | | |
| Design (Style) | Colonial/Ranch | Duplex | 0 | Duplex | 0 | | |
| Quality of Construction | Frame | Vinyl | 0 | Vinyl | 0 | | |
| Actual Age | 118/33 | 98 | 0 | 138 | 0 | | |
| Condition | Average | Average | | Average | | | |
| Gross Building Area | 1980/1604 | 1672 | 19000 | 2482 | 11000 | | |

| Unit Breakdown | Total | Bdrms | Baths | Total | Bdrms | Baths | +(-) | Total | Bdrms | Baths | +(-) | Total | Bdrms | Baths | +(-) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unit # 1 | 5 | 2 | 1 | 4 | 1 | 1 | 0 | 5 | 2 | 1 | 0 | | | | |
| Unit # 2 | 5 | 3 | 1.5 | 5 | 2 | 1 | 1000 | 5 | 2 | 1 | 1000 | | | | |
| Unit # 3 | | | | | | | | | | | | | | | |
| Unit # 4 | | | | | | | | | | | | | | | |

| | SUBJECT | COMP #4 | +(-) | COMP #5 | +(-) | COMP #6 | +(-) |
|---|---|---|---|---|---|---|---|
| Basement Description | 612/1604 | 836 | 0 | 1020 | 0 | | |
| Basement Finished Rooms | Unfinished | Unfinished | | Unfinished | | | |
| Functional Utility | Average | Average | | Average | | | |
| Heating/Cooling | FA/No | FA/No | | FA/No | | | |
| Energy Efficient Items | Rated Average | Rated Average | | Rated Average | | | |
| Parking On/Off Site | 2 Car Garage | None | 8000 | None | 8000 | | |
| Porch/Patio/Deck | Deck,Porch | Porches | 0 | Porches | 0 | | |
| Fireplace | 1 F/P | None | 1500 | None | 1500 | | |
| Net Adjustment (Total) | | ☒ + ☐ - | $ 56000 | ☒ + ☐ - | $ 49500 | ☐ + ☐ - | $ |
| Adjusted Sale Price of Comparables | | Net Adj. 41.5 % Gross Adj. 47.4 % | $ 190900 | Net Adj. 57.6 % Gross Adj. 63.4 % | $ 135400 | Net Adj. % Gross Adj. % | $ |
| Adj. Price Per Unit (Adj. SP Comp/ # of Comp Units) | | $ 95450 | | $ 67700 | | $ | |
| Adj. Price Per Room (Adj. SP Comp/ # of Comp Rooms) | | $ 21211 | | $ 13540 | | $ | |
| Adj. Price Per Bedrm (Adj. SP Comp/ # of Comp Bedrooms) | | $ 63633 | | $ 33850 | | $ | |

**Summary of Sales Comparison Approach**

Comp#4 and 5 are active listings in the subject's market area. It was necessary to make larger than normal adjustments for comp #4&5. It was also necessary to have a more than 20% GLA variance for comp #4&5.

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | 6/19/1979 | 12/30/2003 | |
| Price of Prior Sale/Transfer | | 23300 | 52000 | |
| Data Source(s) | Beaver Co. Deeds | Beaver Co. Deeds | Beaver Co. Deeds | |
| Effective Date of Data Source(s) | 07/17/2018 | Date of Report | Date of Report | |

Analysis of prior sale or transfer history of the subject property and comparable sales

AI Ready

| Borrower/Client | Phyllis Haney | | | | |
|---|---|---|---|---|---|
| Property Address | 535 McCaugherty Run Rd | | | | |
| City | Darlington | County | Beaver | State | PA | Zip Code | 16115 |
| Lender | Wells Fargo Bank NA | | | | |

Form data: Type of Appraisal
Zarnich & Associates R.E. Appraiser

Site Comments
No adverse environmental conditions were noted during the property inspection affecting the subject or surrounding properties.  However, as I have no expertise in environmental matters, I strongly recommend that any questions or concerns be evaluated by a qualified expert prior to finalizing any decisions regarding the subject property.

The market value conclusion in this report is based upon the presumption that there are no conditions of environmental concern which affect the subject property, including, but not limited to, hazardous or toxic wastes, wetlands, buried storage tanks, underground fires, lead based paint, PCB's and radon gas.

I have not checked the land records for recorded easements and have reported only apparent easements, encroachments and other apparent adverse conditions.

The subject is serviced by a well and septic system, which is common to the area. There is no reduction in value. No public water or sewage is available to the subject.

Form data: Sales or Financing Concessions
0

Comments on Sales Comparison

Form data: Indicated Value by Sales Comparison Analysis: Desc.
One Hundred Eighty Thousand Dollars

Conditions of Appraisal
This appraisal is not a home inspection and the appraiser is not acting as a home inspector when preparing the report. The borrower has the right to have the home inspected by a professional home inspector.

When performing the inspection of this property, the appraiser visually observed areas that were readily accessible. The appraiser is not required to disturb or move anything that obstructs access or visibility.

The subject photos used in this report are original photos, generated by a digital camera and have not been altered or enhanced by any means.

The value estimated in this report is based on the assumption that there are no hazardous mold conditions present in the property. The appraiser noted no apparent, readily observable conditions of negative water drainage throughout the property which may indicate potential or present mold problems. These include, but are not limited to, foundation or plumbing leaks; excessive moisture in the basement, crawl space, or attic; improper flashing and/or improperly installed synthetic stucco. It is possible that tests and inspections made by qualified inspectors would reveal the existence of possible mold problems in the property which may affect value.

The Appraiser is not a home or environmental inspector. The Appraiser provided an opinion of value. The appraisal does not guarantee that the property is free of defects or environmental problems. The Appraiser performs an inspection of visible and accessible areas only. Mold may be present in areas the Appraiser cannot see. A professional home inspection or environmental inspection is recommended.

As a condition of the Appraisers acceptance of this order assignment, the Appraiser agrees to comply with the terms of the Gramm-Leach-Biley Act, and will not share any consumer non-public information with anyone other than the lender/client.

No infestation was noted during the property inspection. However, I have no expertise in determining the presence of any infestation.

The signature on the appraisal is an electronic signature. The Appraiser signing the report ensures that the signature is protected and that only the Appraiser maintains control of the signature.

Form data: Economic Age
55

# Market Conditions Addendum to the Appraisal Report

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

Property Address **535 McCaugherty Run Rd**    City **Darlington**    State **PA**    ZIP Code **16115**

Borrower  **Phyllis Haney**

Instructions: The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

## MARKET RESEARCH & ANALYSIS

| Inventory Analysis | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 5 | 7 | 4 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | 0.83 | 2.33 | 1.33 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Total # of Comparable Active Listings | 9 | 7 | 14 | ☐ Declining | ☒ Stable | ☐ Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | 10.84 | 3.00 | 10.53 | ☐ Declining | ☒ Stable | ☐ Increasing |

| Median Sale & List Price, DOM, Sale/List % | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Median Comparable Sale Price | 100500 | 97500 | 106350 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Median Comparable Sales Days on Market | 40 | 49 | 81 | ☐ Declining | ☒ Stable | ☐ Increasing |
| Median Comparable List Price | 119900 | 145000 | 132400 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Median Comparable Listings Days on Market | 139 | 190 | 79 | ☐ Declining | ☒ Stable | ☐ Increasing |
| Median Sale Price as % of List Price | 80.4 | 88.72 | 90.52 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Seller-(developer, builder, etc.) paid financial assistance prevalent? | ☐ Yes | ☒ No | | ☐ Increasing | ☒ Stable | ☐ Declining |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.).

Seller concessions have not increased or decreased over the past 12 months to the best of our knowledge.

Are foreclosure sales (REO sales) a factor in the market?    ☐ Yes   ☒ No  If yes, explain (including the trends in listings and sales of foreclosed properties).

It is the Appraiser's opinion that foreclosure sales in the subject property value range have no factor in the current market.

Cite data sources for above information.

West Penn MLS

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions.

No pending sales or expired and withdrawn listings were considered to formulate any conclusions for the Subject Market.

## CONDO/CO-OP PROJECTS

If the subject is a unit in a condominium or cooperative project, complete the following:    Project Name:

| Subject Project Data | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Total # of Active Comparable Listings | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Unit Supply (Total Listings/Ab. Rate) | | | | ☐ Declining | ☐ Stable | ☐ Increasing |

Are foreclosure sales (REO sales) a factor in the project?    ☐ Yes   ☐ No  If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

## APPRAISER

Signature _[signature]_

Appraiser Name  **Nicholas Richard Zarnich, II**

Company Name  **Zarnich & Associates**

Company Address  **433 State Street, Beaver PA 15009**

State License/Certification #  **RL139981**    State  **PA**

Email Address  **Zarnich.appraisers@comcast.net**

Signature _____

Supervisory Appraiser Name _____

Company Name _____

Company Address _____

State License/Certification # _____  State _____

Email Address _____

# TEXT ADDENDUM

| | |
|---|---|
| Borrower/Client | Phyllis Haney |
| Property Address | 535 McCaugherty Run Rd |
| City | Darlington County State PA Zip Code 16115 |
| Lender | |

Form data: Type of Appraisal
Zarnich & Associates R.E. Appraiser

| | |
|---|---|
| Borrower/Client | Phyllis Haney |
| Property Address | 535 McCaugherty Run Rd |
| City | Darlington |
| County | Beaver |
| State | PA |
| Zip Code | 16115 |
| Lender | Wells Fargo Bank NA |



**FRONT OF SUBJECT PROPERTY**

Appraised Date: July 17, 2018

Appraised Value: $180000

**REAR OF SUBJECT PROPERTY**

**STREET SCENE**

# ADDITIONAL PHOTOGRAPH ADDENDUM



| | |
|---|---|
| Borrower/Client | Phyllis Haney |
| Property Address | 535 McCaugherty Run Rd |
| City | Darlington | County | Beaver | State | PA | Zip Code | 16115 |
| Lender | Wells Fargo Bank NA |



Street Scene



Subject



RENTAL COMPARABLE #1
35 Berry Street
Baden, PA 15005

File

| | |
|---|---|
| Borrower/Client | Phyllis Haney |
| Property Address | 535 McCaugherty Run Rd |
| City | Darlington |
| County | Beaver |
| State | PA |
| Zip Code | 16115 |
| Lender | Wells Fargo Bank NA |



RENTAL COMPARABLE #2

288/292 Martin&Sportman Rd

South Beaver Twp, PA 16115



RENTAL COMPARABLE #3

2412 W Irwin St

Aliquippa, PA 15001

# COMPARABLES PHOTOGRAPH ADDENDUM

| | |
|---|---|
| Borrower/Client | Phyllis Haney |
| Property Address | 535 McCaugherty Run Rd |
| City | Darlington |
| County | Beaver |
| State | PA |
| Zip Code | 16115 |
| Lender | Wells Fargo Bank NA |



### Comparable Sale 1

35 Berry Street

Baden  PA  15005

Date of Sale: 4/20/18DOM40

Sale Price: 125200

Sq. Ft.: 

$ / Sq. Ft.: 



### Comparable Sale 2

68/70 Beaver Street

Fallston  PA  15066

Date of Sale: 11/16/16dom190

Sale Price: 75800

Sq. Ft.: 

$ / Sq. Ft.: 



### Comparable Sale 3

288/292 Martin/Sportsman Rd

South Beaver Twp  PA  16115

Date of Sale: 4/3/17DOM215

Sale Price: 320000

Sq. Ft.: 

$ / Sq. Ft.:

# COMPARABLES PHOTOGRAPH ADDENDUM

File

| | |
|---|---|
| Borrower/Client | Phyllis Haney |
| Property Address | 535 McCaugherty Run Rd |
| City | Darlington |
| County | Beaver |
| State | PA |
| Zip Code | 16115 |
| Lender | Wells Fargo Bank NA |



### Comparable Sale 4

201 Patterson Ave

West Mayfield        PA      15010

Date of Sale:  Listed

Sale Price:        134900

Sq. Ft.:

$ / Sq. Ft.:



### Comparable Sale 5

1010 Penn Ave

New Brighton        PA      15066

Date of Sale:  Listed

Sale Price:        85900

Sq. Ft.:

$ / Sq. Ft.:

### Comparable Sale 6

Date of Sale:

Sale Price:

Sq. Ft.:

$ / Sq. Ft.:

# LOCATION MAP ADDENDUM

| | |
|---|---|
| Borrower/Client | Phyllis Haney |
| Property Address | 535 McCaugherty Run Rd |
| City | Darlington | County | Beaver | State | PA | Zip Code | 16115 |
| Lender | Wells Fargo Bank NA |



Subject
535 McCaugherty Run Rd
Darlington, PA 16115

Comparable Sale 4
201 Patterson Ave
West Mayfield, PA 15010
6.06 miles SE

Comparable Rental 2
288/292 Martin&Sportman Rd
South Beaver Twp, PA 16115
3.85 miles SW

Comparable Sale 5
1010 Penn Ave
New Brighton, PA 15066
8.77 miles SE

Comparable Sale 3
288/292 Martin & Sportsman Rd
South Beaver Twp, PA 16115
3.85 miles SW

Comparable Sale 2
68/70 Beaver Street
Fallston, PA 15066
9.36 miles SE

Comparable Rental 1
35 Berry Street
Baden, PA 15005
17.17 miles SE

Comparable Sale 1
35 Berry Street
Baden, PA 15005
17.17 miles SE

Comparable Rental 3
2412 W Irwin St
Aliquippa, PA 15001
17.00 miles SE

Map data ©2018 Google

Borrower/Client    Phyllis Haney

Property Address   535 McCaugherty Run Rd

City   Darlington          County   Beaver          State   PA      Zip Code   16115

Lender   Wells Fargo Bank NA



AI Ready PDF Generated on 07/23/2018 8:44:07 AM

# ADJUSTABLE RATE NOTE
## (LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY. THIS LOAN HAS A PREPAYMENT PENALTY PROVISION.**

| September 9, 2004 | Rolling Meadows | IL |
|---|---|---|
| [Date] | [City] | [State] |

535 MCCAUGHTRY RUN ROAD, DARLINGTON, PA 16115
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ **232,000.00** (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is **Argent Mortgage Company, LLC** .

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of **8.450 %.** This interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making payments every month.

I will make my monthly payments on the first day of each month beginning on **November 1, 2004** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on **October 1, 2034** , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the maturity date.

I will make my payments at: **505 City Parkway West, Suite 100, Orange, CA 92868**

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ **1,775.67** . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of **October, 2006** , and on that day every **sixth** month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."

If at any point in time the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **six** percentage point(s) ( **6.000 %**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eight of one percent (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

Initials

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **10.450** % or less than **8.450**%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One** percentage point(s) **1.000%**) from the rate of interest I have been paying for the preceding six  months. My interest rate will never be greater than **14.450** % or less than **8.450** %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5.  **PREPAYMENT PRIVILEGE**

I may repay all or any part of the principal balance of this Note in accordance with the terms of this Section. A "prepayment" is any amount that I pay in excess of my regularly scheduled payments of principal and interest that the Lender will apply to reduce the outstanding principal balance on this Note in accordance with this Section.

**(A) Prepayment Made Two (2.00) year(s) After the Date of this Note**

I will not have to pay a prepayment charge if I make a prepayment on the Two (2.00) year anniversary of the date this Note is executed, or at any time thereafter.

**(B) Prepayment Made Within Two (2.00) year(s) of the Date of this Note**

If the original principal balance of my loan exceeds $50,000.00, I will pay Lender a prepayment charge if, in any twelve (12) month period before the Two (2.00) year anniversary of the date this Note is executed, I prepay more than 20% of the original principal balance of this Note. The prepayment charge will be six (6) months interest, at the rate then in effect on this Note, on the amount in excess of 20% of the original principal balance that I prepay within such 12 month period.

**(C) Application of Funds**

I agree that when I indicate in writing that I am making a prepayment, the Lender shall apply funds it receives first to pay any prepayment charge and next in accordance with the order of application of payments set forth in Section 2 of the Security Instrument.

**(D) Monthly Payments**

If I make a prepayment of an amount less than the amount needed to completely repay all amounts due under this Note and Security Instrument, my regularly scheduled payments of principal and interest will not change as a result.

6.  **LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me.  If a refund reduces the principal, the reduction will be treated as a partial prepayment.

7.  **BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payment**

If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be **6.000%** of my overdue payment of principal and interest.  I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount.  The date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full  as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

8.  **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given notice of that different address.

Initials: _____

09/09/2004 8:41:08 AM

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition, to the protections given to the Note Holder under this Note, A Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That the Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without the Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonable determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition of Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**Oral agreements, promises or commitments to lend money, extend credit, or forbear from enforcing repayment of a debt, including promises to extend, modify, renew or waive such debt, are not enforceable. This written agreement contains all the terms the Borrower(s) and the Lender have agreed to. Any subsequent agreement between us regarding this Note or the instrument which secures this Note, must be in a signed writing to be legally enforceable.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Borrower  PHYLLIS J HANEY

_____ (Seal)
Borrower

PAY TO THE ORDER OF
AMERIQUEST MORTGAGE COMPANY
WITHOUT RECOURSE
ARGENT MORTGAGE COMPANY, LLC

BY: _____
WAYNE LEE, PRESIDENT

BY: _____
JOHN P. GRAZER, E.VP/C.F.O.

PAY TO THE ORDER OF _____ (Seal)
Borrower

WITHOUT RECOURSE
AMERIQUEST MORTGAGE COMPANY

BY: _____
WAYNE LEE, President/C.E.O.

BY: _____
KAREN CHRISTENSEN, C.F.( _____ (Seal)

_____ (Seal)
Borrower

Prepared By:Argent Mortgage Company,

Tokeshia Mckinney
2550 Golf Road, East Tower, 10th
Floor,Rolling Meadows, IL 60008

Return To:

Argent Mortgage Company, LLC
P.O. Box 14130,
Orange, CA 92863-1530

Parcel Number:

———————————————[Space Above This Line For Recording Data]———————————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated September 9, 2004
together with all Riders to this document.
**(B) "Borrower"** is ALBERT H BILOTTO and PHYLLIS J HANEY

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is Argent Mortgage Company, LLC

Lender is a Limited Liability Company

PENNSYLVANIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT            Form 3039  1/01

VMP®-6(PA) (0008)
Page 1 of 16                    Initials: AHB
    VMP MORTGAGE FORMS -

09/09/2004 8:41:08

3219797
Page: 1 of 25
09/15/2004 08:49A

B&G ABSTRACTORS/MAIL      MORT      89.00 Beaver County

organized and existing under the laws of Delaware
Lender's address is One City Boulevard West  Orange, CA 92868

Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated September 9, 2004
The Note states that Borrower owes Lender two hundred thirty-two thousand and 00/100
                                                                                    Dollars
(U.S. $232,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than October 1, 2034              .
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials: _____

-6(PA) (0008)                     Page 2 of 16        09/09/2004 8:41:06    Form 3039   1/01

3219797
Page: 2 of 25
09/15/2004 08:49A
B&G ABSTRACTORS/MAIL    MORT    89.00 Beaver County

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the County [Type of Recording Jurisdiction] of BEAVER [Name of Recording Jurisdiction]:
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF:

which currently has the address of 535 MCCAUGHTRY RUN ROAD

[Street]

DARLINGTON [City], Pennsylvania 16115 [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

Initials: HHB c

VMP -6(PA) (0008)          Page 3 of 16          09/09/2004 8:41:08  Form 3039  1/01

3219797
Page: 3 of 25
09/15/2004 08:49A
B&G ABSTRACTORS/MAIL     MORT     89.00 Beaver County

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be

Initials: _____

B&G ABSTRACTORS/MAIL        MORT      89.00 Beaver County

paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest

3219797
Page: 5 of 25
09/15/2004 08:49A

B&G ABSTRACTORS/MAIL      MORT     89.00 Beaver County

shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

3219797
Page: 7 of 25
09/15/2004 08:49A
B&G ABSTRACTORS/MAIL   MORT   89.00 Beaver County

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

3219797
Page: 8 of 25
09/15/2004 08:49A
B&G ABSTRACTORS/MAIL    MORT    89.00 Beaver County

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

-6(PA) (0008)

Initials: AHS

Page 9 of 16   09/09/2004 8:41:08   Form 3039   1/01

3219797
Page: 9 of 25
09/15/2004 08:49A

B&G ABSTRACTORS/MAIL     MORT     89.00 Beaver County

**(b)** Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be

3219797
Page: 10 of 25
09/15/2004 08:49A
B&G ABSTRACTORS/MAIL    MORT    89.00  Beaver County

dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to

-6(PA) (0008)    Page 11 of 16    09/09/2004 8:41:88    Form 3039  1/01

Initials: AHB

3219797
Page: 11 of 25
09/15/2004 08:49A

B&G ABSTRACTORS/MAIL    MORT    89.00 Beaver County

have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or

Initials: _AHB_ _MP_

09/09/2004 8:41:08   Form 3039   1/01

3219797
Page: 12 of 25
09/15/2004 08:49A

B&G ABSTRACTORS/MAIL     MORT     89.00 Beaver County

agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

    **20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

    Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

    **21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

**25. Reinstatement Period.** Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

**26. Purchase Money Mortgage.** If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

**27. Interest Rate After Judgment.** Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

Initials: _____

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_Donna J. Schempp_

_____ (Seal)
PHYLLIS J HANEY                      -Borrower

_Donna J. Schempp_

_____ (Seal)
ALBERT H BILOTTO                     -Borrower

_____ (Seal)        _____ (Seal)
-Borrower                                -Borrower

_____ (Seal)        _____ (Seal)
-Borrower                                -Borrower

_____ (Seal)        _____ (Seal)
-Borrower                                -Borrower

3219797
Page: 15 of 25
09/15/2004 08:49A

B&G ABSTRACTORS/MAIL    MORT    89.00 Beaver County

**Certificate of Residence**

I, *Donna J. Schempp*, do hereby certify that the correct

address of the within-named Mortgagee is *2550 Golf Road East Tower 10th Fl*

*Rolling Meadows, IL 60008*

Witness my hand this _____*9th*_____ day of *September 2004*
         Day                                          Month/Year

*Donna J. Schempp*
Agent of Mortgagee

**COMMONWEALTH OF PENNSYLVANIA** *Allegheny* **County ss:**

On this the _____*9th*_____ day of *September 2004* before me,
         Day                              Month/Year

the undersigned officer, personally appeared *Phyllis J. Haney and*

*Albert H Bilotto*

known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposes herein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: *4-23-05*

*Donna J. Schempp*

Notarial Seal
Donna J. Schempp, Notary Public
Kennedy Twp., Allegheny County
My Commission Expires Apr. 23, 2005
Member, Pennsylvania Association of Notaries

Title of Officer

**3219797**
Page: 16 of 25
09/15/2004 08:49A
B&G ABSTRACTORS/MAIL     MORT     89.00  Beaver County

# 1-4 FAMILY RIDER
### (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 9th     day of September, 2004 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to Argent Mortgage Company, LLC

(the
"Lender") of the same date and covering the Property described in the Security Instrument and located at:
535 MCCAUGHTRY RUN ROAD, DARLINGTON, PA 16115

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to
the Property described in the Security Instrument, the following items now or hereafter attached to the
Property to the extent they are fixtures are added to the Property description, and shall also constitute the
Property covered by the Security Instrument: building materials, appliances and goods of every nature
whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the
Property, including, but not limited to, those for the purposes of supplying or distributing heating,
cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and
access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves,
refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens,
blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings,
all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the
Property covered by the Security Instrument. All of the foregoing together with the Property described in
the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to
in this 1-4 Family Rider and the Security Instrument as the "Property."

MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Initials: ____

Page 1 of 4      Form 3170 1/01

-57R (0008)     VMP MORTGAGE FORMS -     09/09/2004 8:41:08 AM

**3219797**
Page: 17 of 25
09/15/2004 08:49A

B&G ABSTRACTORS/MAIL    MORT    89.00 Beaver County

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii)

09/09/2004 8:41:08 AM

Initials: _AHB_

Form 3170 1/01

B&G ABSTRACTORS/MAIL    MORT    89.00 Beaver County

3219797
Page: 18 of 25
09/15/2004 08:49A

Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

09/09/2004 8:41:08 AM

Initials:



BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____ (Seal)   _____ (Seal)
PHYLLIS J HANEY          -Borrower   ALBERT H BILOTTO         -Borrower

_____ (Seal)   _____ (Seal)
                        -Borrower                            -Borrower

_____ (Seal)   _____ (Seal)
                        -Borrower                            -Borrower

_____ (Seal)   _____ (Seal)
                        -Borrower                            -Borrower

3219797
Page: 20 of 25
09/15/2004 08:49A
B&G ABSTRACTORS/MAIL    MORT    89.00 Beaver County

# ADJUSTABLE RATE RIDER

## (LIBOR Six-Month-Index (As Published in the Wall Street Journal)- Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 9th day of September , 2004   and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Argent Mortgage Company, LLC (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

535 MCCAUGHTRY RUN ROAD, DARLINGTON, PA  16115
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS**. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of  8.450 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

## 4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A) Change Dates
The interest rate I will pay may change on the first day of  October, 2006 , and on that day every sixth  month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in the Wall Street Journal.  The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information.  The Note Holder will give me notice of this choice.

Initials _AHB_

Loan Number: ███████████

3219797
Page: 21 of 25
09/15/2004 08:49A
B&G ABSTRACTORS/MAIL    MORT    89.00 Beaver County

09/09/2004 8:41:08 AM

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **six** percentage points ( **6.000** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **10.450% or less than 8.450%.** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One( **1.000** %) from the rate of interest I have been paying for the preceding  six months. My interest rate will never be greater than 14.450)% or less than 8.450)%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Loan Number: ██████████

Initials _AHB_

610-2 (Rev 1/0'

**3219797**
**Page: 22 of 25**
09/15/2004 08:49A

09/09/2004 8:41:08 AM

B&G ABSTRACTORS/MAIL      MORT      89.00 Beaver County

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing. If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)  _____ (Seal)
Borrower PHYLLIS J HANEY                  Borrower ALBERT H BILOTTO

_____ (Seal)  _____ (Seal)
Borrower                                  Borrower

Loan Number: ███████████

610-3

**3219797**
Page: 23 of 25
09/15/2004 08:49A

B&G ABSTRACTORS/MAIL    MORT    89.00 Beaver County

09/09/2004 8:41:08 AM

All that certain piece, parcel or lot of land situate in Darlington Township, County of Beaver and Commonwealth of Pennsylvania, designated as Parcel B in the James J. and Margaret A. Popa Subdivision Plan No. 1 and recorded in Beaver County Plan Book Volume 24, page 53.

Parcel No. ██████████

██████████████████████████ **3219797**
Page: 24 of 25
09/15/2004 08:49A
B&G ABSTRACTORS/MAIL     MORT     89.00 Beaver County

(HANEY, PHYLLIS.PFD/ ███████

When recorded, mail to:
Argent Mortgage Company, LLC
P.O. Box 14130,
Orange, CA 92863-1530

Loan Number: ███████████

# ASSIGNMENT OF MORTGAGE

COMMONWEALTH OF PENNSYLVANIA }

**Record First**

BEAVER    COUNTY,

FOR VALUE RECEIVED, the undersigned  Argent Mortgage Company, LLC
does hereby grant, bargain, sell, convey, assign and deliver unto _____
Ameriquest Mortgage Company at 1100 Town Country RD#800, Orange, CA 92868

that certain Mortgage dated    09/09/04    and executed by
ALBERT H BILOTTO and PHYLLIS J HANEY  Mortgagor

to the undersigned, which Mortgage is recorded in the office of the Recorder of Deeds of  BEAVER County of
Pennsylvania, in Book _____ , Volume _____ , and
Page _____ , together with the debt thereby secured and the note ( in the amount of $
**232,000.00** ) therein described and having and all right, title, and interest of the undersigned in and to the land and
property conveyed by said Mortgage, said premises being situated in DARLINGTON , County of BEAVER ,
Pennsylvania, and known as: Instrument # 3219797 Recorded on: 09/15/04
Property Address: 535 Mccaughtry Run Road, Darlington, PA 16115
"LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF"

   IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed in its name by its
duly authorized officer, on 09/10/2004.
To have and to hold unto Ameriquest Mortgage Company , its successors and assigns forever.

Argent Mortgage Company, LLC
ATTEST:

By: _____          By: _____
(Authorized Officer) Tracy Phinizy              (Authorized Officer) Catherine Sullivan

**Certificate of Residence**
   I, Janice M. Baker , do hereby certify that the correct address of the within-named Lender is
2550 Golf Road, East Tower, 10th Floor  Rolling Meadows, IL 60008

State of   Illinois
County of  Cook                                       _____
                                                          Agent of Lender

On   09/10/2004   before me, Janice M. Baker
personally appeared  Tracy Phinizy  and  Catherine Sullivan
Authorized Officers of  Argent Mortgage Company, LLC
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the
entity upon behalf of which is the person(s) acted, executed the instrument.

```
OFFICIAL SEAL
JANICE M. BAKER
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 05/19/2007
```

WITNESS my hand and official seal

_____ (Seal)
Janice M. Baker

700-PA (Rev 11/98)

**3513830**
2 Pages
08/31/2015 10:57:55 AM
Beaver County
ASGN          $54.00



# LEGAL DESCRIPTION

All that certain piece, parcel or lot of land situate in Darlington Township, County of Beaver and Commonwealth of Pennsylvania, designated as Parcel B in the James J. and Margaret A. Popa Subdivision Plan No. 1 and recorded in Beaver County Plan Book Volume 24, page 53.

Parcel No █████████████████



I hereby CERTIFY that this document is recorded in the Recorder's Office of Beaver County, Pennsylvania

This Document Recorded
08/31/2015
10:57:55 AM
Instrument: ASGN

Instr #: 3513830
Receipt #: 2015874618
Rec Fee: $54.00
Beaver County, Recorder of Deeds

When recorded, mail to:
Ameriquest Mortgage Company
P.O. Box 11507,
Santa Ana, CA 92711

Loan Number: ▮▮▮▮▮▮▮

# ASSIGNMENT OF MORTGAGE

**COMMONWEALTH OF PENNSYLVANIA** }

**Record Second**

**BEAVER    COUNTY,**

FOR VALUE RECEIVED, the undersigned  Ameriquest Mortgage Company
does hereby grant, bargain, sell, convey, assign and deliver unto <u>U.S. Bank National</u>
<u>Association, as Trustee, successor in interest to Wachovia,*</u>

that certain Mortgage dated  09/09/04   and executed by
ALBERT H BILOTTO and PHYLLIS J HANEY Mortgagor
*Bank, N.A., as Trustee for Park Place Securities, Inc.,
Asset-Backed Pass-Through Certificates, Series 2004-WWF1 at
60 Livingston Avenue, St. Paul, MN 55107

to the undersigned, which Mortgage is recorded in the office of the Recorder of Deeds of  BEAVER County of
Pennsylvania, in Book                         , Volume                         , and
Page                         , together with the debt thereby secured and the note ( in the amount of $
**232,000.00** ) therein described and having and all right, title, and interest of the undersigned in and to the land and
property conveyed by said Mortgage, said premises being situated in DARLINGTON , County of BEAVER ,
Pennsylvania, and known as:  Instrument# 3219797 Recorded on: 09/15/04
Property Address: 535 Mccaughtry Run Road, Darlington, PA 16115
"LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF"

IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed in its name by its
duly authorized officer, on  09/10/2004.

To have and to hold unto
, its successors and assigns forever.

Ameriquest Mortgage Company
ATTEST:

By: _____            By: _____
(Authorized Officer) Tracy Phinizy              (Authorized Officer) Catherine Sullivan
**Certificate of Residence**

I, Janice M. Baker , do hereby certify that the correct address of the within-named Lender is
1100 Town and Country Road, Suite 200, Orange, CA 92868

_____
**State of  Illinois**                                        Agent of Lender
**County of  Cook**

On   09/10/2004   before me,  Janice M. Baker
personally appeared  Tracy Phinizy  and  Catherine Sullivan
Authorized Officers of  Ameriquest Mortgage Company
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the  within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the
entity upon behalf of which is the person(s) acted, executed the instrument.

WITNESS my hand and official seal

```
OFFICIAL SEAL
JANICE M. BAKER
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 05/19/2007
```

_____ (Seal)
Janice M. Baker

700-PA  (Rev 11/98)

**3513831**
2 Pages
08/31/2015 10:57:55 AM
Beaver County
ASGN          $55.00

MORTGAGE SERVICES/FEDEX

# LEGAL DESCRIPTION

All that certain piece, parcel or lot of land situate in Darlington Township, County of Beaver and Commonwealth of Pennsylvania, designated as Parcel B in the James J. and Margaret A. Popa Subdivision Plan No. 1 and recorded in Beaver County Plan Book Volume 24, page 53.

Parcel No. ███████████



I hereby CERTIFY that this
document is recorded in
the Recorder's Office of
Beaver County, Pennsylvania

This Document Recorded
08/31/2015
10:57:55 AM
Instrument: ASGN

Instr #: 3513831
Receipt #: 2015874618
Rec Fee: $55.00
Beaver County, Recorder of Deeds